Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio

# OPINION

No. 04-08-00933-CV

IN RE Rick **GODWIN** and Eagle's Nest Christian Fellowship Church, Inc.
n/k/a Summit Christian Center

Original Mandamus Proceeding[1]

Opinion by:    Catherine Stone, Chief Justice

Sitting:    Catherine Stone, Chief Justice
            Rebecca Simmons, Justice
            Steven C. Hilbig, Justice

Delivered and Filed:   June 10, 2009

PETITION FOR WRIT OF MANDAMUS CONDITIONALLY GRANTED

In this mandamus proceeding we must determine whether the trial court properly assumed

jurisdiction over a dispute between an individual and his former pastor and church. The individual,

Larry Nail, contends the dispute involves a purely secular tort action and that the trial court thus had

subject matter jurisdiction. The pastor, Rick Godwin, and his church, Eagle's Nest Christian

Fellowship Church, claim the dispute involves matters of church governance and discipline, and that

under the ecclesiastical abstention doctrine, the trial court abused its discretion in asserting subject

---

[1] This proceeding arises out of Cause No. 2008-CI-08066, styled *Larry C. Nail v. Rick Godwin and Eagle's Nest Christian Fellowship Church, Inc. now known as Summit Christian Center*, pending in the 45th Judicial District Court, Bexar County, Texas, the Honorable Barbara Nellermoe presiding.

matter jurisdiction. Based on the record before us, and in light of the great deference given to the First Amendment's freedom of religion guarantee, we hold that the ecclesiastical abstention doctrine precludes judicial review of the pastor's conduct. Accordingly, for the reasons set forth below, we conditionally grant the petition for writ of mandamus.

## BACKGROUND

Eagle's Nest Christian Fellowship Church, Inc. n/k/a Summit Christian Center ("ENCF") is a nondenominational, fundamentalist Christian church. Senior Pastor Rick Godwin is an ordained minister and founder of the church. The church is run by Godwin and a Board of Elders form of governance that is biblically based. The Board of Elders is the highest church tribunal and is charged with oversight of religious doctrine, church governance, church discipline, and church finances. When performing its duties, the Board of Elders acts in accordance with the tenets of the faith of the church and the dictates of the Bible as understood by the Elders. A Finance Committee handles all financial expenditures by ENFC, which the Board of Elders must approve.

ENCF experienced tremendous growth in 2007 and hired James Yostrum as its new comptroller to review its accounting practices and ensure its compliance with all applicable laws. Yostrum became concerned with ENCF's expenditures after he was hired, but failed to convey his concerns to ENCF's Finance Committee. Yostrum subsequently resigned from his position as comptroller. Upon his resignation from ENCF, Yostrum kept private financial documents belonging to ENCF, allegedly because he was "afraid for his license." Yostrum later provided these financial documents to a reporter from the San Antonio Express-News, who posted the documents on the newspaper's website.

Larry Nail, an active church member since 1997 and a generous donor to ENCF, became concerned about ENCF's financial expenditures. Nail decided to address Godwin and several members of the Board of Elders about his concerns. According to Nail, neither Godwin nor the Board of Elders was receptive when approached about the church's alleged financial improprieties. Nail was dissatisfied with ENCF's response to his concerns and resigned from ENCF and from a church ministry group that he had founded.

Nail began emailing members of ENCF about the church's alleged misuse of its resources. Nail encouraged those he contacted to leave the church and to "rise up" against Godwin. He also made comments comparing ENCF to a "Frankenstein monster" and suggesting that mega churches, like ENCF, "were not really following God or following the Bible." Nail's conduct upset some church members and caused disruption within the congregation. Many members of ENCF perceived Nail's conduct as an attack against Godwin and the church.

Nail also contacted several ENCF employees, including Rose Roqué, Clayton Mabry, and Louie Kaupp, and urged them to leave the church and make a public statement about the church's purported financial misconduct. In an effort to persuade Roqué, Mabry, and Kaupp to take action, Nail allegedly offered the employees financial assistance in the event these individuals were terminated for speaking out against the church. Nail's offer was interpreted as an act of bribery and was rejected by the individuals approached by Nail.

In November 2007, the San Antonio Express-News published a series of articles about ENCF and Godwin. The articles focused on the financial affairs of the church and criticized Godwin

and ENCF for improperly using church funds.[2]  The Express-News's articles caused dissension, strife, and confusion within the congregation.

Godwin and the Board of Elders had several meetings following the publication of the newspaper articles to discuss the church's problems and the persistent complaints by Nail.  At these meetings, Godwin and the Board of Elders consulted the Bible and prayed about their situation.  Godwin and the Board of Elders ultimately determined they needed to take affirmative action against Nail to protect the church and restore harmony to the congregation.  Godwin and the Board of Elders proceeded to draft a statement for Godwin to read to the congregation from the pulpit.  The statement they prepared provided, in part, as follows:

> Paul writes in Romans 16:17: "Mark those who cause division and avoid them."
>
> ***
>
> Larry Nail . . . called Clayton Mabry, who is one [of] our elders here tonight, and Pastor Louis.  He offered them both money to leave the church.  We have several e-mails in our possession that Larry sent to various members of our church making accusations.  We have Larry recorded on Clayton's voicemail, making the same statement.
>
> These are despicable acts of behavior by desperate people who will go to any measure including slander, intimidation and, if you can believe it, bribery.  Our staff was insulted and outraged by Larry's behavior.  It goes beyond Christian comprehension.  And I find it puzzling that these men who claim to stand by ethical conduct have resorted to the lowest of human decency and violation of clear Scripture even to the point of bribery.  Our staff is unified and resolute.  They are the finest people on Earth with a high standard of excellence and ethical behavior, and I could not be more proud of every one of them.

---

[2]  One of the complaints raised by the articles concerned excessive gift giving by Godwin.  Although the extent and cost of the gift giving might be considered excessive by some standards, the record indicates ENCF follows a scripturally-based practice of giving gifts and honorariums to those who provide service to the church.

Godwin read the statement to the congregation at four different services on November 24 and 25, 2007. The services at which Godwin read the statement included members of the congregation, regular church attendees, and people interested in the church. The record indicates Godwin also made the following comment before he read the statement to the congregation: "I welcome you tonight, as well as any members of the Express-News . . . who may be present." It is unclear whether any journalist from the Express-News actually attended Godwin's services at the time he read the statement "marking" Nail.

Nail filed suit against Godwin and ENCF after Godwin read the statement "marking" him for his actions, alleging causes of action for intentional infliction of emotional distress, defamation, and fraud. Godwin and ENCF responded by filing a plea challenging the court's jurisdiction, contending Nail's suit involved an ecclesiastical dispute concerning internal church affairs and church disciplinary matters, which the trial court is precluded from adjudicating. Specifically, Godwin and ENCF argued the trial court was prohibited from adjudicating Nail's claims because: "they acted in accordance with the dictates of the Bible and the Church with respect to [Nail's] conduct; Nail's "conduct was disruptive to the congregation"; Nail "leaked confidential information"; Nail "offered financial inducements to church members to divulge private church matters"; and Godwin's and ENCF's "conduct was a matter of managing its internal affairs and deciding church discipline." The trial court rejected these contentions and denied the plea to the jurisdiction. Godwin and ENCF subsequently filed this original mandamus proceeding.

## STANDARD OF REVIEW

When there is no adequate remedy by appeal, mandamus relief is proper to correct a clear abuse of discretion. *In re Dep't of Family & Protective Servs.*, 273 S.W.3d 637, 643 (Tex. 2009); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135-36 (Tex. 2004). An appellate court improperly issues mandamus if the trial court did not abuse its discretion or if the record fails to demonstrate the lack of an adequate remedy on appeal. *In re Dep't of Family & Protective Servs.*, 273 S.W.3d at 643; *In re Prudential*, 148 S.W.3d at 135-36. "Whether a clear abuse of discretion can be adequately remedied by appeal depends on a careful analysis of the costs and benefits of interlocutory review." *In re Dep't of Family & Protective Servs.*, 273 S.W.3d at 645; *see In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 464 (Tex. 2008).

"Lack of jurisdiction may be raised by a plea to the jurisdiction when religious-liberty grounds form the basis for the jurisdictional challenge." *Westbrook v. Penley*, 231 S.W.3d 389, 394 (Tex. 2007). A defendant challenging a jurisdictional fact via a plea to the jurisdiction must satisfy the same initial burden as in a traditional summary judgment to succeed. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227-28 (Tex. 2004). In other words, the defendant must conclusively negate the existence of the fact, and judgment is proper in such instance only if the plaintiff cannot present controverting evidence raising a genuine issue of material fact. *Id.* at 228.

The record indicates Godwin and ENCF challenged the trial court's subject matter jurisdiction based on religious-liberty grounds via a plea to the jurisdiction. Generally, a trial court's ruling on a plea to the jurisdiction is not subject to review by mandamus because an adequate remedy by appeal often exists. *Bell Helicopter Textron, Inc. v. Walker*, 787 S.W.2d 954, 955 (Tex. 1990).

The supreme court, however, has recognized that appeal is often inadequate to protect the rights of religious organizations when there are important issues relating to the constitutional protections afforded by the First Amendment. *See Tilton v. Marshall*, 925 S.W.2d 672, 682 (Tex. 1996). It is undisputed by the parties that the present case concerns important issues relating to Godwin and ENCF's First Amendment right to the free exercise of religion. We are of the opinion that an appeal will not adequately protect Godwin and ENCF's rights in this instance; therefore, mandamus is justified under the facts.

## THE ECCLESIASTICAL ABSTENTION DOCTRINE

The First Amendment to the United States Constitution affords broad protection to the free exercise of religion. *Id.* at 677. The First Amendment provides: "'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend I. "This provision mandates that government and religion remain separate.'" *Lacy v. Bassett*, 132 S.W.3d 119, 123 (Tex. App.— Houston [14th Dist.] 2004, no pet.). "Following this constitutional mandate, civil courts may not intrude into the church's governance of 'religious' or 'ecclesiastical' matters, such as theological controversy, church discipline, ecclesiastical government, or the conformity of members to standards of morality." *Williams v. Gleason*, 26 S.W.3d 54, 58 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); *see Westbrook*, 231 S.W.3d at 397-98. "Although wrongs may exist in the ecclesiastical setting, and although the administration of the church may be inadequate to provide a remedy, the preservation of the free exercise of religion is deemed so important a principle it overshadows the inequities that may result from its liberal application." *Williams*, 26 S.W.3d at 59. Thus, in the instant case the relevant fact in issue is not whether ENCF

mismanaged its funds. Rather, the operative issue is whether Godwin's statement was part of church governance or discipline, and thus protected under the First Amendment.

## DISCUSSION

Nail has asserted claims against Godwin and ENCF for intentional infliction of emotional distress, defamation, and fraud. Each of Nail's claims, however, implicates ecclesiastical matters protected from secular review. Because the evidence presented fails to raise a fact question on the jurisdictional issue, we must conclude the trial court's jurisdictional determination constituted a clear abuse of discretion under the circumstances.

### A. Defamation

Nail's defamation claim focuses on Godwin and ENCF's "marking" of Nail before the congregation pursuant to Romans 16:17 following the accusations Godwin and ENCF had misused church funds.[3] The record shows Godwin and the Board of Elders perceived Nail's conduct as a continued adverse influence on the congregation after he resigned his church membership.[4] Nail's negative behavior caused Godwin and the Board of Elders to consult the Bible and pray about how to restore harmony to the congregation. Godwin and the Board of Elders concluded they had a biblical obligation to protect the congregation from Nail's conduct and decided to discipline Nail in accordance with Romans 16:17. Godwin and ENCF's decision to discipline Nail for conduct it

---

[3] The passage Romans 16:17 of the Holy Bible provides: "Now I beseech you, brothers, mark them which cause divisions and offenses contrary to the doctrine which you have learned; and avoid them." Romans 16:17 (American King James Version).

[4] Despite Nail's contention otherwise, the fact that he was no longer a member of ENCF at the time he was disciplined is of no consequence. *See generally Westbrook*, 231 S.W.3d at 404 (upholding application of ecclesiastical abstention doctrine even though plaintiff had voluntarily forfeited her church membership at the time she was disciplined by the church).

deemed contrary to both their Christian values and their interpretation of the Bible is an inherently religious function with which civil courts should not interfere. *See Westbrook*, 231 S.W.3d at 391-92, 397-98 (holding civil courts lacked subject matter jurisdiction over a claim against a pastor who directed his congregation to shun a former parishioner for engaging in a biblically inappropriate relationship because resolving the claim would unconstitutionally entangle the courts in matters of church governance and impinge on the core religious function of church discipline).

We note that at oral argument, in the context of Nail's defamation claim, counsel were questioned about what limits, if any, could be placed on church officials when making comments from the pulpit. Specifically, counsel for Godwin and ENCF opined the church officials would be protected by the ecclesiastical abstention doctrine even if they had stated Nail were a child molester. Counsel for Nail argued in post-submission briefing that such a result would surely not be acceptable under our law. Case law instructs us that there are indeed limits to what can be said by church officials from the pulpit. *See id.* at 396 ("the First Amendment does not necessarily bar all claims that may touch upon religious conduct."). Under the facts of this case, an accusation of inappropriate sexual behavior would likely not be protected; but in this case with the facts in the record, a statement that Nail had engaged in bribery or slander was based on the actions of Nail as perceived by the individuals with whom he interacted. The response by Godwin and the Board of Elders was directed to church governance and maintaining harmony within the congregation. Because Nail's defamation claim encroaches upon the autonomy of the church to decide matters of internal church discipline and governance, the trial court abused its discretion by asserting jurisdiction over this claim.

**B. Intentional Infliction of Emotional Distress**

As for Nail's intentional infliction of emotional distress claim, it too concerns an ecclesiastical matter protected from secular review. Nail's intentional infliction of emotional distress claim alleges he suffered severe emotional distress as a result of Godwin "marking" him before the congregation. The record, however, shows that whenever a person causes division within the congregation, ENCF's religious beliefs allow the church to "mark" the divisive individual. A court's adjudication of Nail's claim "'would necessarily require an inquiry into the truth or falsity of religious beliefs that is forbidden by the Constitution.'" *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 9 (Tex. 2008). Moreover, it is well settled that "intangible, psychological injury, without more, cannot ordinarily serve as a basis for maintaining a tort cause of action against a church or its members for its religious practices." *Id.*; *see also Paul v. Watchtower Bible & Tract Society of New York, Inc.*, 819 F.2d 875, 883 (9th Cir.) ("[i]ntangible or emotional harms cannot ordinarily serve as a basis for maintaining a tort cause of action against a church for its practice – or against its members."). Nail's intentional infliction of emotional distress claim, like his defamation claim, concerns matters of internal church discipline and governance. Consequently, we must conclude the trial court abused its discretion by asserting jurisdiction over Nail's intentional infliction of emotional distress claim as it requires a court to involve itself into ecclesiastical matters.

**C. Fraud**

Nail's fraud claim, which alleges Godwin and ENCF used church funds for improper purposes, also appears to concern an ecclesiastical matter. In *Harris v. Matthews*, 643 S.E.2d 566, 571 (N.C. 2007), plaintiffs alleged a church pastor, secretary, and chairman of the church's board

of trustees made improper financial expenditures. Upon reviewing the plaintiffs' allegations, the court stated "[d]etermining whether actions, including expenditures, by a church's pastor . . . were proper requires an examination of the church's view of the role of pastor, staff, and church leaders, their authority and compensation, and church management." *Id.* The court explained:

> [b]ecause a church's religious doctrine and practice affect its understanding of each of these concepts, seeking a court's review of the matters presented here is no different than asking a court to determine whether a particular church's grounds for membership are spiritually or doctrinally correct or whether a church's charitable pursuits accord with the congregation's beliefs. None of these issues can be addressed using neutral principles of law.

*Id.*

Similarly, in *Wolter v. Delgatto*, No. 14-05-00055-CV, 2006 WL 664214, *2 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (mem. op.), the plaintiff accused her former church of conversion and misusing church funds in connection with a development project. The plaintiff argued the trial court had subject matter jurisdiction over her claims against the church because they related to financial and not doctrinal matters. *Id.* The court of appeals, however, disagreed. *Id.* The *Wolter* court explained the plaintiff's case concerned whether the church followed its constitution when it became involved with a housing and urban development project. *Id.* The court emphasized that "[t]his is true despite [the plaintiff's] attempt to invoke the trial court's jurisdiction by framing her claims in civil terms." *Id.* The court therefore concluded the plaintiff's "claims, viewed substantively and considering the effect of their resolution by a civil court, relate to how and when [the church] may spend its resources and are thus ecclesiastic in nature." *Id.*

Like the plaintiffs in *Harris* and *Wolter*, Nail raises allegations about misuse of church funds. Nail asserts Godwin and ENCF were poor stewards of church funds and failed to use the church's

resources for "good church purposes." From the mandamus record before us, it appears some of the disputed financial expenditures may have been approved by ENCF's Finance Committee, which, under ENCF's belief system, owes a responsibility to God to ensure the church is run properly. In addition, it appears a biblical basis may exist to support some of the other disputed financial expenditures. The determination of whether Godwin and ENCF's financial expenditures were proper in this case requires an inquiry into whether the expenditures were justified in light of ENCF's religious doctrine and practices. Because this is the type of ecclesiastical inquiry courts are forbidden to make, we conclude the trial court abused its discretion by asserting jurisdiction over Nail's fraud claim.

### Conclusion

"While mandamus relief may not be appropriate in every case in which constitutional rights are impaired," *Tilton*, 925 S.W.2d at 682, we believe mandamus relief is justified under the facts of this case. The trial court should have refrained from exercising jurisdiction over Nail's claims because each claim implicates ecclesiastical matters. Because nothing in the evidence raises a fact question on the jurisdictional issue, we must conclude the trial court's jurisdictional determination constituted a clear abuse of discretion. We therefore conditionally grant relators' petition for writ of mandamus. The writ shall issue only upon certification to this court that the trial court has failed to dismiss the underlying suit for lack of jurisdiction within twenty days from the date of this opinion.

Catherine Stone, Chief Justice