# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00376-CV

### Kenneth Becker, Appellant

### v.

### Carla Hahn Clardy, Appellee

## FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT
## NO. 230,807-B, HONORABLE RICK MORRIS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Kenneth Becker appeals the trial court's order sustaining appellee Carla Hahn Clardy's plea to the jurisdiction. In his petition, Becker sought damages based upon common law claims of libel and slander against Clardy. Clardy responded in her plea that the trial court did not have subject matter jurisdiction over Becker's claims because they fell within the ecclesiastical abstention doctrine (the "Doctrine").[1] Because we conclude that the Doctrine applies to Becker's claims, we affirm the trial court's order sustaining the plea and dismissing Becker's claims for lack of subject matter jurisdiction.

## BACKGROUND

During the relevant time period, Becker and Clardy were employed as religion

---

[1] *See Westbrook v. Penley*, 231 S.W.3d 389 (Tex. 2007); *In re Godwin*, 293 S.W.3d 742 (Tex. App.—San Antonio 2009, orig. proceeding).

teachers at St. Mary's School in Temple, Texas. The school is within the Diocese of Austin, Texas, and part of the Catholic Church. As teachers of the school, both Becker and Clardy were subject to the "Diocese of Austin Policies on Ethics and Integrity in Ministry" (the "Policy").[2] The Policy prohibits church personnel "from engaging in . . . immoral conduct" which is defined as "[c]onduct that is contrary to the discipline and teachings of the Catholic Church and which may result in scandal to the faithful or harm to the ministry of the Catholic Church." The Policy also prohibits church personnel from "harm[ing] the reputation of others by . . . disclosing without legitimate cause the faults or failings of others to persons who have no cause to know them [or by] making false allegations against another."

The Policy sets forth a code of ethics for church personnel and a procedure for reporting, investigating, and disciplining church personnel for misconduct. The code provides that church personnel "shall exhibit the highest Christian ethical standards and personal integrity," "shall conduct themselves in a manner that is consistent with the discipline, norms, and teachings of the Catholic Church," "shall provide a professional work environment that is free from harassment," and "shall share concerns about suspicious or inappropriate behavior with their pastor, their principal, the chancellor or Bishop Gregory Aymond."

Consistent with the Policy, Becker sent a written statement in February 2008 to the principal of the school, copying the pastor and the superintendent of the Diocese of Austin. Becker stated that two students "informed" him that Clardy made "adverse or negative comments" about him in front of students in her religion class. She allegedly told her students that Becker had written

---

[2] The Policy defines "church personnel" to include "[a]ll paid personnel whether employed in areas of ministry or other kinds of services by the Diocese, its parishes, schools or other agencies."

"hate mail," caused Clardy's son to "run away" from Becker's class, and "something about [Becker] following (male) students into the (school) restroom." He further stated that he "consider[ed] Mrs. Clardy's actions and spoken words to be a violation of the Canon Law and a professional code of ethics," "malicious and not in keeping with the teachings of Jesus Christ, in loving thy neighbor as thy self, the precepts of the Catholic faith and Canon Law (Canon 802 § 2)," and "defamation of character and harassment." He then stated his "[e]xpectations" that the pastor and principal "immediately, thoroughly, and quickly" investigate and, if the allegations were true, "immediately" terminate Clardy and require Clardy to apologize. He sought an oral apology in the presence of the eighth grade class, the principal, the pastor, and Becker and a written apology to Becker "and the faculty and staff of St. Mary's school." The principal and pastor conducted an investigation, but Clardy resigned and the investigation stopped.[3]

Becker then filed this suit against Clardy in July 2008. In his petition, Becker alleged that Clardy "made numerous untrue and defamatory statements about Plaintiff, to students, administrators, faculty and/or parents." The alleged slanderous statements were: (i) Becker "had something to do with [a teacher] being fired," (ii) Becker "has a 'hit list' of teachers' names that he wants to target," (iii) Becker "has sent Clardy 'hate mail,'" (iv) Becker "caused Clardy's son to run away from school," and (v) Becker "was the reason Clardy was fired from St. Mary's School." As to his libel claim, Becker alleged that Clardy "communicated . . . defamatory remarks in writing." The alleged published statements, including statements to Becker's "superiors," were that: (i) Becker "humiliated a 6th grade student during Stations," (ii) "Clardy had serious concerns

---

[3] In his deposition, Becker testified that he attended meetings with the principal and the pastor concerning his allegations against Clardy but that "everything came to a halt once Mrs. Clardy resigned."

regarding her son's emotional and spiritual well-being" in Becker's class, and (iii) Becker was "harassing" Clardy and "created a hostile work environment."

Clardy filed a plea to the jurisdiction contending that the trial court lacked jurisdiction because the statements and events alleged by Becker fell within the ecclesiastical abstention doctrine. The trial court held an evidentiary hearing on the plea. Clardy's evidence included excerpts from the oral deposition of the principal, a copy of the Policy, Becker's written statement in February 2008 to the principal, and excerpts from Becker's oral deposition. Becker filed a response to the plea, but he did not present evidence at the hearing. After the hearing, the trial court signed an order sustaining Clardy's plea to the jurisdiction and dismissing the case. This appeal followed.

## ANALYSIS

### Standard of Review

"Lack of jurisdiction may be raised by a plea to the jurisdiction when religious-liberty grounds form the basis of the jurisdictional challenge." *See Westbrook v. Penley*, 231 S.W.3d 389, 394 (Tex. 2007*)*. We review a plea questioning the trial court's subject matter jurisdiction de novo. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). We focus first on the plaintiff's petition to determine whether the facts that were pled affirmatively demonstrate that subject matter jurisdiction exists. *Id.* at 226. We construe the pleadings liberally in favor of the plaintiff. *Id*. If a plea to the jurisdiction challenges the existence of jurisdictional facts, the trial court may consider evidence and must do so when necessary to resolve the jurisdictional issues raised. *Id*. at 227; *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000).

4

*The Ecclesiastical Abstention Doctrine*

Becker's sole issue is whether the trial court correctly determined that it lacked subject matter jurisdiction based upon the ecclesiastical abstention doctrine. The Doctrine "prevents secular courts from reviewing many types of disputes that would require an analysis of 'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required.'" *Patton v. Jones*, 212 S.W.3d 541, 547–48 (Tex. App.—Austin 2006, pet. denied) (quoting *Watson v. Jones*, 80 U.S. 679, 733 (1872)); *see Westbrook*, 231 S.W.3d at 397–98; *In re Godwin*, 293 S.W.3d 742, 747–48 (Tex. App.—San Antonio 2009, orig. proceeding); *Williams v. Gleason*, 26 S.W.3d 54, 58 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). "[C]ivil courts are to accept 'as final, and as binding on them' the decisions of an ecclesiastical institution on such matters." *Patton*, 212 S.W.3d at 547 (quoting *Watson*, 80 U.S. at 728).

The Doctrine arises from the Free Exercise Clause of the First Amendment of the Constitution and applies to the states through the Fourteenth Amendment. *See* U.S. Const. amends. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."), XIV. Among its prohibitions, the Free Exercise Clause precludes government action that burdens the free exercise of religion "by encroaching on the church's ability to manage its internal affairs." *Westbrook*, 231 S.W.3d at 395. "Although wrongs may exist in the ecclesiastical setting, and although the administration of the church may be inadequate to provide a remedy, the preservation of the free exercise of religion is deemed so important a principle that it overshadows the inequities that may result from its application." *Williams*, 26 S.W.3d at 59 (citation omitted); *see In re Godwin*, 293 S.W.3d at 750 (courts give "great deference to the First Amendment's

5

freedom of religion guarantee"). To determine whether the Doctrine applies, courts consider the "substance and nature" of the plaintiff's claims and the effect of a judicial resolution, and not whether wrongs may go unaddressed. *See In re Godwin*, 293 S.W.3d at 750 (court considers substance and effect of the claim's resolution by a civil court in determining whether focus of dispute is on ecclesiastical matters); *Patton*, 212 S.W.3d at 548. In this context, we turn to Becker's pleadings and the evidence relevant to the jurisdictional issue. *See Miranda*, 133 S.W.3d at 227–28.

In his petition, Becker seeks damages for alleged defamatory statements. *See* Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (West 2011) (elements of libel); *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998); *Turner v. Church of Jesus Christ of Latter-Day Saints*, 18 S.W.3d 877, 902 (Tex. App.—Dallas 2000, pet. denied) (to prove defamation, private individual "had to show the Church published a false statement and was negligent about the truth of the statement"). Becker alleged that Clardy made statements to "students, administrators, faculty and/or parents" and to "superiors" that "were intended to defame [his] character and reputation." The complained-of statements concerned Becker's actions as a teacher at the school and addressed the subjects of teacher discipline and Becker's interaction with students and other teachers. Becker urges that these statements were purely secular and not ecclesiastical in nature.

It is true that the Free Exercise Clause does not immunize all tort causes of action. *See Pleasant Glade v. Schubert*, 264 S.W.3d 1, 11–12 (Tex. 2008); *Tilton v. Marshall*, 925 S.W.2d 672, 677 (Tex. 1996). But "even though the elements of a common law tort may be *defined* by secular principles without regard to religion, it does not necessarily follow that *application* of those principles to impose civil tort liability would not run afoul of protections the constitution affords to a church's right to construe and administer church doctrine." *Schubert*, 264 S.W.3d at 10

6

(citing *Westbrook*, 231 S.W.3d at 400). Here, the alleged statements and damage to reputation contained in Becker's pleadings were "confined" to the church community. *See Patton*, 212 S.W.3d at 553 (quoting *Heard v. Johnson*, 810 A.2d 871, 884–85 (D.C. App. 2002)); *see id.* at 555 n.12 (distinguishing between alleged defamatory remarks to third persons and remarks published to members of the church community). The evidence presented was conclusive that Becker's claims were limited to damage to his reputation in the church community based upon alleged statements made by Clardy to her students and to Becker's "superiors."[4]

Further, the evidence showed that the substance of Becker's claims was that Clardy had violated the Policy's code of ethics and moral standards of the Catholic faith and Canon Law. The Policy sets forth the code of ethics and required moral standards for church personnel, how church personnel should report "incidents, allegations, and/or concerns," and the procedures for investigation and the range of disciplinary actions for misconduct, including immoral conduct or harassment. Actions of church personnel that "may constitute immoral conduct [or] harassment" "shall be reported" to the pastor, the principal, or certain other identified persons. The procedures provide the "steps in discipline," including termination, and that "it is the responsibility of supervisors to address the problem(s) in a timely and equitable manner." The principal's deposition testimony was that she followed the Policy with respect to the dispute between Becker and Clardy.

Whether or not to "impose civil tort liability" against Clardy for harm to Becker's reputation within the community then necessarily would require an analysis of internal church matters and doctrine. *See Schubert*, 264 S.W.3d at 10; *In re Godwin*, 293 S.W.3d at 750; *Patton*,

---

[4] At the hearing, Becker's counsel stated that "this case is focused solely on the effect that the Defendant's actions had against Mr. Becker's reputation in the community."

7

212 S.W.3d at 548; *see also Westbrook*, 231 S.W.3d at 397 ("It is a core tenant of First Amendment jurisprudence that, in resolving civil claims, courts must be careful not to intrude upon internal matters of church governance."); *see id.* at 400 (alleged defamatory statements could not be "isolated from the church-disciplinary process"). Whether or not it was true that Becker was the reason for teachers to be fired "would require an analysis" of the school's "discipline" decisions in the context of the religious moral standards and church doctrine set forth in the Policy. *See Patton*, 212 S.W.3d at 547–48 (citation omitted); *see also Westbrook*, 231 S.W.3d at 392 ("church discipline" is "core religious" function); *Williams*, 26 S.W.3d at 59 ("Although [plaintiffs] argue their claims arise in tort, we find that each claim implicates an ecclesiastical matter, namely their subjection to the church's discipline."); *Patterson v. Sw. Baptist Theological Seminary*, 858 S.W.2d 602, 605–06 (Tex. App.—Fort Worth 1993, no writ) (matter of employment of seminary faculty "could not be resolved without reference to spiritual meaning of the requirements and guidelines set forth in the faculty manual"). The truth or falsity of Clardy's other alleged statements and the alleged injury to Becker's reputation within the church community also would require an analysis of the church's moral standards and church doctrine. *See In re Godwin*, 293 S.W.3d at 750; *Patton*, 212 S.W.3d at 547–48. Because Becker's alleged harm is limited to the harm to his reputation within the church community, it is measured against the backdrop of the church's religious morals and principles.[5]

---

[5] The dissent analyzes whether Becker can prevail on a defamation claim; however, recitation of the elements of defamation is not dispositive. *See Pleasant Glade v. Schubert*, 264 S.W.3d 1, 11–12 (Tex. 2008) (whether or not "elements of a common law tort may be *defined* by secular principles without regard to religion" is not dispositive issue). The "substance and nature" of Becker's claim—confined to alleged damage to his reputation within the church community—necessarily requires looking at the "community" and what they believe. *See Patton v. Jones*, 212 S.W.3d 541, 547–48 (Tex. App.—Austin 2006, pet. denied) (secular courts precluded from "reviewing . . . disputes that would require an analysis of . . . 'the conformity of the members of the church to the standard of morals required'") (citation omitted).

8

Becker urges that his claims do not challenge action by the school because the school did not reach a decision on whether or not to discipline Clardy. The undisputed evidence, however, was that the school did make a decision by choosing not to take disciplinary action against Clardy after she resigned. *See Westbrook*, 231 S.W.3d at 399 (citing *Watson*, 80 U.S. at 727) ("A church's

The dissent also seems to endorse a piecemeal analysis of whether a particular alleged defamatory statement is subject to the doctrine. We disagree with this approach and find the analysis in *Williams* and *In re Godwin* instructive. *See In re Godwin*, 293 S.W.3d at 750; *Williams v. Gleason*, 26 S.W.3d 54, 58 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). In both cases, the plaintiffs asserted defamation among their claims, and the court found their claims subject to the doctrine by analyzing the overall dispute.

In *In re Godwin*, our sister court held that the ecclesiastical abstention doctrine precluded judicial review of all the plaintiff's claims asserted against a pastor and the pastor's church. The plaintiff asserted, among his claims, defamation based upon the pastor's statements about the plaintiff from the "pulpit" including accusing the plaintiff of "bribery." 293 S.W.3d at 746, 748–49. Whether or not this particular statement was defamatory seemingly could have been determined without reference to the church's doctrine or affairs but that was not the analysis. The court did not view this statement separately, instead focusing on the overall dispute to conclude that the plaintiff's claims "implicate[d] ecclesiastical matters protected from secular review." *Id*. at 748.

Similarly, in *Williams*, the court concluded that all of the plaintiffs' claims against members of the church were precluded by the ecclesiastical abstention doctrine. 26 S.W.3d at 55. The plaintiffs, among their claims, asserted that two of the defendants "wrote a libelous letter" to the plaintiffs "attacking their character." In dismissing all claims, the court explained:

> Whether this suit is ecclesiastical, or concerns property rights, torts, or criminal conduct, is determined by first examining the substance and effect of the [plaintiffs'] petition—without considering what they use as claims—to determine its ecclesiastical implication.
>
> . . .
>
> Thus, because appellant's *entire* suit would require us to review the ecclesiastical judicial process and to determine the efficacy of the parties' religious beliefs and practices, we find we are without jurisdiction to decide this suit.

*Id*. at 59–60 (emphasis added). Again, the court did not utilize a piecemeal approach, but looked to the overall controversy to determine if the doctrine applied.

9

decision to discipline members for conduct considered outside of the church's moral code is an inherently religious function with which civil courts should not generally interfere."). In his deposition, Becker agreed that he was subject to the Policy's "terms and conditions." Consistent with the Policy, Becker advised the principal and pastor of Clardy's alleged statements and set forth his expectations for how they should handle the matter. He also testified that his expectations did not get fulfilled to his satisfaction. Becker chose not to sue the school for its lack of action against Clardy, but brought his claims directly against Clardy. A civil court action resolving Becker's claims then would encroach on the church's "ability to manage its internal affairs." *See Westbrook*, 231 S.W.3d at 395; *see id*. at 399–400 (member of church who submits to the "ecclesiastical power" cannot later "invoke the supervisory power of the civil tribunals"); *Williams*, 26 S.W.3d at 59 ("[M]embers may not involve the state in ecclesiastical government by improperly using the civil justice system to review an ecclesiastical judicatory's action.").

Becker points to the provision in the Policy that instructs church personnel to contact police or civil authorities first if "there is an indication of illegal actions by Church personnel." He urges that this provision shows that the Policy was not meant to be the only source of discipline for Clardy's behavior. Becker, however, has not asserted that Clardy has taken an illegal act. Further, in determining whether the Doctrine applies to tort claims, the courts distinguish intentional torts that endanger public health and safety and that cause physical harm from torts that only cause intangible or emotional harms. *See Westbrook*, 231 S.W.3d at 404. Becker does not seek damages for physical harm but for harm to his reputation within the church community.[6] *See Schubert*, 264 S.W.3d at 12

---

[6] We acknowledge that defamation may be committed in a religious setting. However, where the alleged damages are limited to damage to reputation within the church community and

("Particularly, when the adherent's claim, as here, involves only intangible, emotional damages allegedly caused by a sincerely held religious belief, courts must carefully scrutinize the circumstances so as not to become entangled in a religious dispute.").

As part of his issue, Becker also contends that the Doctrine applies only to claims against authority figures in the church or the church itself and, therefore, that it does not apply to his claims against a fellow member of the community and co-worker.[7] It is true that courts have applied the Doctrine to claims asserted against church members who are in positions of authority. *See Williams*, 26 S.W.3d at 59 ("Ecclesiastical immunity would be an empty protection if a disgruntled member, denied the chance to sue the religious body, sued instead the members of the religious body who disciplined him."). The Texas Supreme Court, however, has applied the Doctrine to tort claims by a church member against other church members who were not in authority positions. *See Schubert*, 264 S.W.3d at 12 (holding court lacked jurisdiction to consider church member's assault claims against other church members). We, therefore, decline to preclude the application of the Doctrine to Becker's claims on this ground.

**CONCLUSION**

Considering Becker's pleaded claims and the evidence relevant to the jurisdictional issue, we conclude that the ecclesiastical abstention doctrine applies to Becker's claims. *See*

---

measured against the backdrop of religious beliefs and "the standard of morals required," we cannot intervene. *See Patton*, 212 S.W.3d at 547–48.

[7] Clardy argues that Becker has not preserved this particular argument. Because we conclude that the Doctrine applies here, we need not address this additional argument in support of the trial court's order. *See* Tex. R. App. P. 47.1.

11

*Miranda*, 133 S.W.3d at 227–28. We therefore overrule Becker's issue and affirm the trial court's order sustaining Clardy's plea to the jurisdiction and dismissing the case for lack of jurisdiction.

_____

Melissa Goodwin, Justice

Before Justices Puryear, Henson and Goodwin;
    Dissenting Opinion by Justice Henson

Affirmed

Filed:   December 22, 2011